A09A2314. TURNER BROADCASTING SYSTEM, INC.
v. McDAVID et al.

(693 SE2d 873)

BERNES, Judge.

This case involves Turner Broadcasting System, Inc.'s ("Turner") alleged breach of an oral agreement to sell the Atlanta Hawks and Atlanta Thrashers sports teams and the operating rights to Philips Arena to appellee David McDavid. Following a jury trial, a $281 million verdict was entered in favor of McDavid on his breach of contract claim. Turner filed a motion for judgment notwithstanding the verdict ("j.n.o.v."), or in the alternative, for a new trial, which the trial court denied. Turner appeals, contending that (1) the evidence failed to show (a) that the parties intended to be bound in the absence of an executed written agreement or (b) that the parties reached agreement on all material terms of the sale; (2) the evidence failed to show that the basketball and hockey leagues would have approved the sale; (3) the trial court erred in failing to give its requested jury charge on league approval; and (4) the damages were speculative, excessive, and decidedly against the weight of the evidence.[1] We discern no error and affirm.

> If a jury has returned a verdict, which has been approved by the trial judge, then the same must be affirmed

---

[1] Turner further contends that the trial court erred in denying its motion for j.n.o.v. or for a new trial as to a promissory estoppel claim. While the jury found in favor of McDavid on this claim, the trial court entered judgment only for the breach of contract claim, the larger of the duplicative awards. See generally *Ga. Northeastern R. v. Lusk*, 277 Ga. 245, 246 (1) (587 SE2d 643) (2003) (a double recovery of damages is prohibited, and the plaintiff is entitled to only one recovery deemed to make the plaintiff whole). Because the trial court's final judgment was not entered on the promissory estoppel claim, those issues are moot.

on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the verdict will be upheld on appeal.

(Citation and punctuation omitted.) *City of Atlanta v. WH Smith Airport Svcs.*, 290 Ga. App. 206 (659 SE2d 426) (2008). See also *Rental Equip. Group v. MACI, LLC*, 263 Ga. App. 155, 157 (1) (a) (587 SE2d 364) (2003).

So viewed, the evidence at trial showed that Turner is the former owner of the Hawks and the Thrashers, with operating rights to Philips Arena (the "assets"). In October 2002, Turner publicly announced its interest in selling the assets as part of a "deleveraging program" to reduce its mounting debts. In November 2002, McDavid expressed an interest in buying the assets and entered into negotiations with Turner.[2]

On April 30, 2003, the parties executed a "Letter of Intent," outlining the proposed sale terms and establishing a 45-day exclusive negotiating period. On June 14, 2003, the Letter of Intent expired with no agreement, but the parties continued to negotiate. When McDavid inquired about extending the Letter of Intent, Turner's principal negotiator told him, "Don't worry about it. We're very, very close to a deal. You're our guy."

The parties scheduled a meeting for mid-July 2003, expecting that they would be able to resolve all of the outstanding issues and finalize their agreement. At the meeting, Turner raised a tax loss allocation issue, which the parties failed to resolve. Frustrated with the lack of progress being made during the negotiations, McDavid walked out of the meeting, while his advisors continued their efforts to resolve the tax issue.

On July 30, 2003, the parties engaged in a conference call. During the conference call, McDavid's advisors stated that McDavid would agree to Turner's proposed resolution of the tax issue on the condition that it would resolve all the issues and finalize the deal. Turner's CEO, Phil Kent, agreed and announced, "we have a deal."

The parties subsequently exchanged multiple drafts of the purchase agreement and its exhibits. During the legal drafting

---

[2] McDavid formed several corporate entities – Atlanta Sports, LP; Atlanta Thrashers, LP; McDavid Arena Operations, LP; and McDavid Sports Marketing, LP – to be the purchasers in the transaction. These entities were also named as plaintiffs in the lawsuit.

process, the parties' counsel identified additional "open issues" for the written agreements.

On or about August 1, 2003, Turner drafted an internal memo to its employees and planned for a press conference to publicly announce the deal with McDavid. In August 2003, Turner consulted with McDavid and his advisor on team management decisions, including the hiring of a general manager and a head coach for the Hawks. Turner also obtained McDavid's approval before hiring a trainer, assistants, and scouts.

On or about August 16, 2003, as the drafting process continued, Turner's executive and principal negotiator, James McCaffrey, approached McDavid about a simplified restructure for the transaction, assuring him that the restructure would "not change the deal," that the "deal was done," and that "they were ready to close on the deal that [they] made on July 30th." McDavid agreed to the simplified restructure, and the attorneys circulated revised draft agreements that reflected the restructured terms.

On August 19, 2003, the corporate board of directors of Time Warner, Turner's parent company, approved the sale of the assets to McDavid based upon the restructured terms. However, two of the board members, Ted Turner and Steve Case, opposed the deal, concerned that the assets had been undervalued and had resulted in a "fire sale."

On the day after the Turner board of directors meeting, Ted Turner's son-in-law, Rutherford Seydel, and the son of a member of the Hawks' board of directors, Michael Gearon, Jr., approached Turner about purchasing the assets on behalf of their corporation, Atlanta Spirit, LLC. While Turner continued to exchange drafts of the purchase agreement with appellees, it also began negotiations with Atlanta Spirit.

On or about September 12, 2003, McDavid and Turner verbally reached a final agreement on each of the alleged open items for the written agreement and Turner's principal negotiator announced, "[t]he deal is done. Let's get documents we can sign and we'll meet in Atlanta for a press conference and a closing [early next week]." But later that same day, Turner's principal negotiator and its in-house counsel signed an agreement for the sale of the assets to Atlanta Spirit.

On September 15, 2003, as McDavid was preparing to travel to Atlanta for the closing and a press conference to announce the sale, he received a phone call informing him that Turner was "going in another direction" and had sold the assets to Atlanta Spirit. McDavid and his advisors, who had spent months finalizing the McDavid deal, were "stunned," "shocked," "disappointed," and felt "completely broadsided."

McDavid filed suit against Turner, alleging claims of breach of an oral contract to sell the assets, promissory estoppel, fraud, and breach of a confidentiality agreement. Turner denied the existence of any binding agreement, arguing that the parties had not executed a final written purchase agreement and had continued to negotiate the material terms of the transaction. Following an eight-week trial, the jury returned a verdict in favor of McDavid on the breach of oral contract claim and awarded $281 million in damages.[3] Judgment was entered accordingly.

1. Turner first argues that the trial court erred in denying its motion for j.n.o.v. or for a new trial on the breach of oral contract claim. Turner contends that the uncontroverted evidence established that the parties manifested an intent to be bound only in writing, and that the parties never reached agreement on all material terms of the sale. We disagree. The evidence on the issue of contract formation was highly controverted and presented genuine issues of fact for the jury's resolution. Because there was evidence supporting the jury's verdict, we must affirm. See *City of Atlanta*, 290 Ga. App. at 206; *Rental Equip. Group*, 263 Ga. App. at 157 (1) (a); *Northern Assurance Co. &c. v. Roll*, 176 Ga. App. 893 (1) (a) (338 SE2d 870) (1985).

"To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." OCGA § 13-3-1. See *Cline v. Lee*, 260 Ga. App. 164, 168 (1) (581 SE2d 558) (2003). Turner's contentions relate only to the assent element.

As an initial matter, Georgia law recognizes that oral contracts falling outside the purview of the Statute of Frauds[4] may be binding and enforceable. See *Cochran v. Eason*, 227 Ga. 316, 318 (1) (180 SE2d 702) (1971) (holding that "[a]ssent to the terms of a contract may be given other than by signatures"); *Taylor v. Taylor*, 217 Ga. 20, 22-23 (2) (120 SE2d 874) (1961) (recognizing the validity of an oral agreement, despite the written agreement having been unsigned); *Rushin v. Ussery*, 298 Ga. App. 830, 832-833 (1), (2) (681 SE2d 263) (2009) (breach of contract claim based upon oral contract to make a will where claim fell outside Statute of Frauds); *McKenna*

---

[3] As previously noted, the jury also found in favor of McDavid on the promissory estoppel claim, but judgment was not entered on that claim. The jury found in favor of Turner on McDavid's claims for breach of a confidentiality agreement and fraud, and rejected McDavid's request for prejudgment interest on the damages for the breach of contract claim.

[4] See OCGA § 13-5-30 (providing that agreements relating to certain subject matters must be in writing and signed by the party to be obligated). The parties do not contend that the oral agreement at issue was subject to the Statute of Frauds requirements.

*v. Capital Resource Partners, IV, L.P.*, 286 Ga. App. 828, 832-833 (1) (650 SE2d 580) (2007) (concluding that questions of fact existed as to whether the parties had reached a verbal settlement agreement, notwithstanding their failure to sign a written document); *Cline*, 260 Ga. App. at 167-168 (1) (affirming jury's verdict in favor of plaintiff on a breach of an oral contract claim relating to a subdivision development); *Pacrim Assocs. v. Turner Home Entertainment*, 235 Ga. App. 761, 764-766 (1) (510 SE2d 52) (1998) (breach of contract claim based upon evidence of a binding oral agreement); *Danfair Properties v. Bowen*, 222 Ga. App. 425 (474 SE2d 295) (1996) (affirming jury verdict awarding plaintiff commissions based upon an oral employment agreement); *Gen. Hosps. of Humana v. Jenkins*, 188 Ga. App. 825, 826-827 (1) (374 SE2d 739) (1988) (affirming judgment based upon a valid oral lease); *Merry v. Ga. Big Boy Mgmt.*, 135 Ga. App. 707, 708 (1) (218 SE2d 694) (1975) (same). Even complex or expensive contracts may be oral, as long as the evidence establishes the parties' mutual assent to all essential terms of the contract. See, e.g., *Bibb Distrib. Co. v. Stewart*, 238 Ga. App. 650, 653-654 (1) (519 SE2d 455) (1999) (affirming judgment on breach of an oral agreement pertaining to a $6.8 million insurance policy); *Royal Mfg. Co. v. Denard & Moore Constr. Co.*, 137 Ga. App. 650, 651 (2) (224 SE2d 770) (1976) (holding that a contract for the construction of a commercial building could be oral). See also *APAC-Southeast v. Coastal Caisson Corp.*, 514 FSupp.2d 1373, 1381 (II) (B) (2) (N.D. Ga. 2007) (applying Georgia law and denying summary judgment on a breach of an oral contract claim relating to a construction project).

> In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent. Further, in cases such as this one, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.

(Citations and punctuation omitted.) *McKenna*, 286 Ga. App. at 832 (1). See also *Cox Broadcasting Corp. v. Nat. Collegiate Athletic Assn.*, 250 Ga. 391, 395 (297 SE2d 733) (1982); *Terry Hunt Constr., Inc. v.*

*AON Risk Svcs. &c.*, 272 Ga. App. 547, 551 (3) (613 SE2d 165) (2005); *Legg v. Stovall Tire &c.*, 245 Ga. App. 594, 596 (538 SE2d 489) (2000). In this case, the determination of whether an oral contract existed, notwithstanding the parties' failure to sign a written agreement, was a question of fact for the jury to decide. See *McKenna*, 286 Ga. App. at 832-833 (1); *Terry Hunt Constr.*, 272 Ga. App. at 551-552 (3); *Legg*, 245 Ga. App. at 596-597.

(a) *Parties' Intent to be Bound.*

(i) *The Parties' Expressions and Conduct.* The parties' objective manifestations of their mutual assent and intent to be bound to the McDavid acquisition deal included testimony that Turner's CEO formally announced, "we have a deal" during the parties' July 30 conference call. On or about August 16, 2003, Turner's principal negotiator further confirmed the existence of an agreement during discussions pertaining to the deal restructure by stating that the "deal was done," and that "they were ready to close on the deal that [they] made on July 30th." And yet again, on or about September 12, 2003, during the course of another conference call to confirm the parties' final agreement on the terms to be incorporated into the written agreements, Turner's principal negotiator announced, "[t]he deal is done. Let's get documents we can sign and we'll meet in Atlanta for a press conference and a closing [early next week]."

In addition, Turner engaged in conduct from which the jury could conclude that an agreement had been reached. On or about August 1, 2003, Turner drafted an internal memo to its employees and planned for a press conference to publicly announce the deal with McDavid.[5] Furthermore, in August 2003, Turner consulted with McDavid and his advisor on team management decisions, including the hiring of a general manager and a head coach for the Hawks. Turner also obtained McDavid's approval before hiring a trainer, assistants, and scouts.[6] There was testimony that according to

---

[5] Turner's communications executive testified that the memo and press releases were only in draft form, were not released, and did not establish that a deal had been reached. Significantly, the draft memo announced that "[Turner has] reached final agreement with David McDavid for the sale of the [assets]." Although the memo and press releases were in draft form, the jury could conclude based upon the other evidence and testimony that an agreement had been reached, as stated in the draft announcement.

[6] While Turner points to evidence that it consulted with McDavid regarding team decisions as a courtesy and that the consultations began before the date of the alleged final agreement, McDavid's advisor testified that he had more serious involvement with the team decisions after the deal was reached. On August 20, 2003, Turner's sports executive sent an internal e-mail, confirming that he had "gotten the blessing" from McDavid's advisor regarding the contract for the Hawks' trainer. On August 27, 2003, Turner's sports executive sent another internal e-mail, confirming that he had discussed the hiring of the coach, scout staff, and players with McDavid's advisor and that McDavid's advisor had "approve[d] . . . all of it." The inferences that could be drawn from this evidence created a genuine issue for the jury's determination and could not be resolved as a matter of law.

industry standards, a buyer typically would not be given such formal input on team decisions until after the parties were committed and had formed an agreement. This evidence authorized the jury to conclude that both parties intended to be bound to the McDavid acquisition deal.

(ii) *The Letter of Intent.* Turner nevertheless argues that no binding oral agreement could have been reached since the parties' April 30 Letter of Intent expressly provided that "neither party nor any of [their] affiliates [would] be bound . . . unless and until such party (or affiliate) has executed the Definitive Agreements" and that "[n]o such binding agreement shall exist or arise unless and until the parties have negotiated, executed and delivered to each other Definitive Agreements." Undoubtedly, the express terms of the Letter of Intent reflect an intent that the parties would not be bound absent written, signed agreements. Significantly, however, it is undisputed that the terms of the Letter of Intent expired on June 14, 2003, and further that Turner declined to renew it.[7] The Letter of Intent provided that all of its terms, with the exception of the confidentiality terms,[8] would "automatically terminate and be of no further force and effect at 5:00 p.m. (Atlanta time) on [June 14, 2003,] the date on which the Exclusive Negotiation Period expire[d]." Turner's general counsel affirmed that when the Letter of Intent expired, it "no longer ha[d] any meaning" and the only terms that survived related to confidentiality. The jury therefore was authorized to conclude that upon the expiration of the Letter of Intent, the terms imposing the written agreement requirement also expired and had no effect. And, as recognized by Turner's general counsel, if Turner intended for the writing requirement of the Letter of Intent to remain effective after the expiration date, it could have set forth a survival provision in the same manner that it did for the confidentiality terms. Its failure to do so serves as some evidence contradicting Turner's claim that it maintained an objective manifestation to be bound only by a written agreement.

Turner's general counsel stated that the Letter of Intent was the only place where the parties had expressed their intent to be bound exclusively by executed, written agreements. McDavid and his advi-

---

[7] After the Letter of Intent expired and McDavid inquired about extending it, Turner's principal negotiator told him that it was unnecessary since they were close to finalizing the deal and assured him, "You're our guy." Based upon this evidence, in addition to Turner's other assurances, the jury was authorized to infer that Turner intended to be bound to the McDavid deal.

[8] The Letter of Intent specified that "[e]xcept as provided in the Confidentiality Agreement, and except for the provisions set forth in [the paragraph governing certain confidentiality terms] of this letter, upon the expiration of the term[s] of this letter, neither party shall have any further liability or obligation whatsoever hereunder[.]"

sors testified that after the Letter of Intent expired, no one expressed an intention that the parties would be bound only upon the execution of written contracts. When Turner's CEO and principal negotiator made their statements, "we have a deal" and the "deal was done," McDavid and his advisors believed that both parties intended to be bound to the agreement. Although Turner maintains that its intent to be bound only by written agreements never changed, its general counsel conceded that statements such as "we have a deal" may convey otherwise. See *Cochran*, 227 Ga. at 317-318 (1) (assent may be manifested by the parties' expressions in addition to the parties' contract language). The parties' failure to communicate an intent to be bound only in writing following the expiration of the Letter of Intent provided some evidence that an oral agreement was not precluded. See *Mason v. Rabun Waste*, 174 Ga. App. 462, 463 (1) (330 SE2d 400) (1985).

(iii) *Contemplation of Written Instrument.* It is undisputed that the parties intended to sign written documents that memorialized the terms of their oral agreement. McDavid and his advisors testified that in accordance with the customary deal-making process, the parties first had to reach an oral agreement upon the material terms, and then the lawyers were expected to prepare the written documents that memorialized the parties' agreed upon terms.[9] The evidence further established that the parties' respective lawyers exchanged multiple draft agreements purportedly attempting to ensure that the documents reflected the agreed upon terms.[10] And, while the draft agreements contained a merger clause providing that the written agreement would "supersede all prior agreements, understandings and negotiations, both written and *oral*," (emphasis supplied) such language could be construed as acknowledging the possibility of an oral agreement, particularly under these circumstances in which the merger clause did not become effective.

McDavid's witnesses further testified that all of the material issues for the written agreements had been resolved by mid-September, when they were planning to travel to Atlanta to formally

---

[9] According to McDavid's counsel for the transaction,
[t]he principals had a deal. It was up to the lawyers to make sure that it was reflected accurately in the documents[.] . . . [W]hen there's a deal, there's a deal. . . . There's a point beyond which you don't have the right to say, . . . ["]I'm walking, or, I have changed my mind.["] And we felt, without any doubt, that we were past that point.

[10] Both parties expressed frustration with the manner in which the lawyers were handling the drafting process. In a June 13, 2003 e-mail exchange with Turner's CEO regarding the television rights, Turner's principal negotiator had indicated, "[n]one of this is open. All details left, nothing that would impact economics by a penny. Perhaps too muc[h] lawyering on BOTH sides[.] . . . [S]eems like both camps of lawyers don't like each other, maybe causing them to be . . . overly aggressive[.]"

sign the documents and publicly announce the deal.[11] The evidence thus authorized a finding that the only reason for the failure to execute the written agreements was Turner's refusal to proceed with McDavid's deal and its decision to consummate a deal with Atlanta Spirit instead.

While circumstances indicating that the parties intended to prepare a subsequent writing is strong evidence that they did not intend to be bound by a preliminary agreement, contrary evidence bearing upon the parties' intent to be bound and reflecting the existence of a binding oral agreement presents a question of fact for the jury's determination. See *Denton v. Etheridge*, 73 Ga. App. 221, 225-226 (2) (36 SE2d 365) (1945). Moreover, "[a]lthough the parties contemplated the future execution of a written . . . agreement, the jury was authorized to find that a binding oral agreement was in effect, and the failure to sign the written instrument did not affect the validity of the oral agreement." (Citation and punctuation omitted.) *Gen. Hosps. of Humana*, 188 Ga. App. at 827 (1); *Merry*, 135 Ga. App. at 708 (1). See also *Barton v. Chemical Bank*, 577 F2d 1329, 1336 (5th Cir. 1978) ("At common law an oral contract may be enforceable despite the contemplation of a subsequent written contract.") (applying Georgia law); *Pacrim Assocs.*, 235 Ga. App. at 765-766 (1).

(iv) *Requirement of League Approvals.* In support of its claim that the parties only intended to be bound in writing, Turner points to evidence that approvals from the National Basketball Association ("NBA") and the National Hockey League ("NHL") were required to consummate the transaction, and that such league approvals would not be conferred absent a written agreement. While the leagues' requirement for a writing serves as some evidence of the parties' intent, it is not dispositive in this case. "[T]he requirement of [league] approval[s] was a condition of contract performance, not of contract formation." *Bd. of Regents &c. of Ga. v. Doe*, 278 Ga. App. 878, 882 (1) (b) (630 SE2d 85) (2006). See also *Jackson Elec. Membership Corp. v. Ga. Power Co.*, 257 Ga. 772, 773-774 (1) (364

---

[11] While there was evidence that the parties continued to revise the drafted documents, McDavid's counsel for the transaction testified that it was not unusual for documents to be exchanged and revised throughout the process until time for closing, even though an agreement to the material terms had already been reached. Turner's general counsel also testified that the preparation of a closing checklist of open items after an agreement had been reached was not unusual. For example, although Turner maintained that it had a binding written agreement with Atlanta Spirit on September 12, 2003, some of the documents for that deal had not yet been finalized and continued to be revised after the execution of Atlanta Spirit's purchase agreement. Turner and Atlanta Spirit continued to negotiate open terms regarding the promissory note, support agreement, television rights agreement, and the LLC agreement. And subsequently, on March 31, 2004, Atlanta Spirit's purchase agreement was amended to revise its terms.

SE2d 556) (1988); *Goobich v. Waters*, 283 Ga. App. 53, 56-57 (1) (640 SE2d 606) (2006); *Herrman v. Conway*, 83 Ga. App. 888, 890-891 (1) (65 SE2d 41) (1951), overruled on other grounds by *Crankshaw v. Stanley Homes, Inc.*, 131 Ga. App. 840, 842 (1) (207 SE2d 241) (1974). In other words, the requirement for league approvals was not an element of contract formation, but rather was a condition subsequent to be met after the parties had already formed the oral agreement by expressing their assent. As indicated above, there was evidence from which the jury could conclude that the parties entered into a binding oral agreement with the intent to sign written documents that memorialized the terms, but failed to do so as a result of Turner's breach. By entering into their agreement, "each promisor has impliedly promised to use his best efforts to bring about the happening of the condition to his promise." (Citation and punctuation omitted.) *Jackson Elec. Membership Corp.*, 257 Ga. at 774 (1). Turner, therefore, could not avoid the existence of an oral agreement by breaching and preventing the fulfillment of the condition subsequent. See id.; *Bd. of Regents &c. of Ga.*, 278 Ga. App. at 881-882 (1) (b); *Herrman*, 83 Ga. App. at 890-891 (1).

(b) *Agreement upon All Material Terms.* To constitute a binding agreement, the evidence must establish that the parties agreed upon all essential terms. See OCGA § 13-3-2 ("The consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract[.]"); *McKenna*, 286 Ga. App. at 833 (2).

Again, the evidence on this issue was hotly contested and presented a genuine issue for the jury's determination. While Turner points to evidence that several open issues remained for discussion, that evidence merely conflicted with McDavid's evidence that all the material issues had been resolved. Turner specifically alleges that the parties had not resolved issues relating to television rights, parent capitalization, substitute collateral for the Hawks lien, and employee benefits. McDavid and his advisors, however, testified to the agreed upon terms that had resolved those issues.

Specifically, there was evidence that on June 13, 2003, Turner's principal negotiator sent an e-mail confirming that the television rights were not open issues. Additionally, according to McDavid, he had agreed to pay between $60 million to $70 million for parent capitalization, and the issue had been resolved on April 29, 2003 before they signed the Letter of Intent.[12] As to the issue of the lien, on June 20, 2003, Turner's CEO sent a memo to the board for approval of the transaction, indicating that McDavid had agreed to indemnify Turner if the bond authority required it to post collateral

---

[12] In contrast, Atlanta Spirit was not required to have parent capitalization.

for reinstatement of the Hawks lien. Finally, McDavid and his advisors testified that employee benefits was not an open issue because Turner's principal negotiator informed them that the level of benefits was not material[13] and McDavid had agreed to offer benefits that were standard for the league.

McDavid and his advisors also testified that the material terms of the deal related to the purchase price, assets to be transferred, payment terms, liabilities that McDavid assumed, McDavid's obligation to post collateral for release of the Hawks lien, McDavid's obligation to replace a $15 million letter of credit, and Turner's obligation to retain certain severance obligations. There was some evidence reflecting an agreement upon each of these terms.

A June 20, 2003 memo from Turner's CEO to the board set forth the transaction's structure and described the agreed upon terms.[14] On August 18, 2003, when the transaction was restructured as to the contribution of support payments, a memo describing the restructured deal was also submitted to the board for approval. Based upon Turner's board memos and the testimony of McDavid and his advisors, McDavid was to obtain an 85% ownership interest in the assets for a purchase price of approximately $215 million, representing the total enterprise value. McDavid agreed to accept liabilities, including deferred player compensation, capital accounts, and $140 million of arena debt for his acquisition of arena rights. Turner was to contribute $104 million in support payments to offset operating losses during the transition, which had the effect of reducing the purchase price to $96 million in accordance with the simplified restructure of the deal. The Hawks lien that was in place to secure the bonds on the arena had to be released to allow McDavid to obtain a bank loan to finance a portion of the transaction; Turner agreed to put up a letter of credit to have the Hawks lien released. Under the arena operating agreement, the letter of credit would be released after one year if certain revenue levels continued to be met. If, however, the arena failed to meet the revenue requirement and the lien was reinstated, McDavid agreed to be responsible for the reinstatement costs. McDavid also agreed to post a $60 million letter

---

[13] Thereafter, on September 11, 2003, in an internal e-mail exchange with Turner's employment lawyer, Turner's principal negotiator had described the employee benefits as a "micro-detail." When Turner's employment lawyer expressed that there could be a headline stating, "[t]eams deal held up due to benefits issues, led by lawyers dragging their feet," Turner's principal negotiator responded, that they were "sorta *gaming* the thing[.] [W]hen it['s] over . . . it will be obvious!" (Emphasis supplied.) McDavid contends that this evidence shows that the benefits issue was immaterial and was being raised by Turner solely in efforts to stall the deal.

[14] The June 20, 2003 memo stated that the transaction was "subject to final *documentation* of the contractual arrangements." (Emphasis supplied.)

of credit to indemnify Turner in the event of the reinstatement. If an employee was terminated 18 months after closing, Turner agreed to pay the severance. The tax loss allocation issue, which was the source of contention at the parties' mid-July meeting, was resolved by an agreement that provided both parties with the amounts that they desired. Turner's board approved the deal based upon the terms set forth in the board memos.

According to McDavid, all of the material deal terms had been resolved; but when Atlanta Spirit entered into negotiations, Turner suddenly tried to reopen the issues to derail McDavid's deal and to buy time to complete the deal with Atlanta Spirit. Atlanta Spirit's counsel testified that he assumed Turner was using documents from the McDavid deal for their transaction since the terms were already very detailed and the drafts were complete.[15] Material terms of the Atlanta Spirit deal, including the percentage of ownership interest, purchase price value, working capital liabilities, employee severance terms, letter of credit terms for the arena, expansion fee terms, preferred vendor terms regarding naming rights, and television rights, were the same or substantially similar to those reached in the McDavid deal. While McDavid spent eight to ten months negotiating the terms of his deal, Atlanta Spirit obtained the same deal within a matter of weeks.

Despite the conflicts in the evidence, the evidence adduced at trial supports the jury's determination that the parties had reached an agreement on all material terms such that a binding oral agreement had been reached by September 12, 2003 when Turner announced, "[t]he deal is done," before Turner went "in another direction" with Atlanta Spirit. "This court existing only for the correction of errors of law, and having no authority to determine the mere weight of the evidence, and the verdict for the plaintiff being fully authorized by testimony, the trial judge did not err in the exercise of his discretion in refusing a new trial." (Citation and punctuation omitted.) *Northern Assurance Co. &c.*, 176 Ga. App. at 893 (1) (a). Likewise, "[s]ince the evidence authorized the verdict in plaintiff's favor, the trial court properly denied [Turner's] motion for judgment notwithstanding the verdict." Id. at 894 (1) (b).

(c) *Persuasive Authority.* Turner argues that affirmance of the jury's verdict in this case is contrary to the common law and that of most jurisdictions. We disagree.

---

[15] Atlanta Spirit referred to McDavid's deal during their negotiations and stated that it expected to get the same deal. Atlanta Spirit's counsel further expressed that he did not believe Turner's representation that an agreement with McDavid had not been reached on definite terms.

Georgia has established legal precedent governing the resolution of this oral contract formation issue. See *APAC-Southeast*, 514 FSupp.2d at 1380-1381 (II) (B) (2) (applying Georgia law). See also *Cox Broadcasting Corp.*, 250 Ga. at 395; *Cochran*, 227 Ga. at 317-318 (1); *Taylor*, 217 Ga. at 22-23 (2); *Rushin*, 298 Ga. App. at 832-833 (1), (2); *McKenna*, 286 Ga. App. at 832-833 (1); *Terry Hunt Constr.*, 272 Ga. App. at 551 (3); *Legg*, 245 Ga. App. at 596; *Pacrim Assocs.*, 235 Ga. App. at 764-766 (1); *Gen. Hosps. of Humana*, 188 Ga. App. at 826-827 (1); *Mason*, 174 Ga. App. at 462-463 (1); *Merry*, 135 Ga. App. at 708 (1). And, Georgia law is consistent with the common law rule that an oral contract may be enforceable despite the contemplation of a subsequent written contract. See *Barton*, 577 F2d at 1336 (applying Georgia law); *Pacrim Assocs.*, 235 Ga. App. at 765-766 (1); *Gen. Hosps. of Humana*, 188 Ga. App. at 827 (1); *Merry*, 135 Ga. App. at 708 (1).

Turner urges this court to adopt a five-factor test utilized by other jurisdictions in determining whether an oral agreement is enforceable as a matter of law:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Entertainment Corp.*, 777 F2d 78, 80-81 (2d Cir. 1985).[16] Even if we were to adopt the suggested five-factor test, our conclusion in this case would be the same. Here, there was evidence that both supported and refuted the existence of a binding oral agreement, and this conflict in the evidence required the jury's resolution. To the extent that the legal authorities relied upon by Turner contained unequivocal objective signs evincing an intent not to be bound orally, they are factually distinguishable.[17] When con-

---

[16] As noted in *APAC-Southeast*, 514 FSupp.2d at 1380-1381 (II) (B) (2), there is no authority suggesting that Georgia has previously adopted the suggested five-factor test.

[17] See *Perles v. Kagy*, 473 F3d 1244, 1249-1251 (II) (1) (D.C. Cir. 2007); *Schaller Tel. Co. v. Golden Sky Systems*, 298 F3d 736, 742-745 (III) (8th Cir. 2002); *Adjustrite Systems v. GAB Business Svcs.*, 145 F3d 543, 549-551 (B) (2d Cir. 1998); *Ciaramella v. Reader's Digest Assn.*, 131 F3d 320, 323-326 (II) (B) (2d Cir. 1997); *Doll v. Grand Union Co.*, 925 F2d 1363, 1367-1370 (II) (A) (11th Cir. 1991); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F2d 69, 74-77 (II) (A) (2d Cir. 1984); *Reprosystem, B.V. v. SCM Corp.*, 727 F2d 257, 261-263 (II) (A) (2d Cir. 1984); *Manon v. Corporate Solutions*, No. 04-73649, 2005 U. S. Dist. LEXIS 35465, at *14-17 (III) (B) (E.D. Mich. Dec. 23, 2005); *Abrams v. Unity Mut. Life Ins. Co.*, 70 FSupp.2d 846, 850-852 (III) (N.D. Ill. 1999); *Continental Laboratories v. Scott Paper Co.*, 759 FSupp. 538, 540-542 (S.D. Iowa

fronted with conflicting evidence of the parties' intent on this issue, numerous other jurisdictions have likewise held that the question is to be left to the determination of the jury or the factfinder. See *Lamle v. Mattel, Inc.*, 394 F3d 1355, 1359-1360 (II) (Fed. Cir. 2005); *Southern Colorado MRI v. Med-Alliance*, 166 F3d 1094, 1098-1100 (I) (10th Cir. 1999); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F3d 1531, 1535-1538 (I) (2d Cir. 1997); *Computer Systems of America v. Intl. Business Machines Corp.*, 795 F2d 1086, 1089-1091 (1st Cir. 1986); *Babdo Sales, Inc. v. Miller-Wohl Co.*, 440 F2d 962, 965 (2d Cir. 1971); *Pearce v. Manhattan Ensemble Theater*, No. 06 CV 1535(KMW), 2009 WL 3152127, at *6-7 (II) (B) (S.D. N.Y. Sept. 30, 2009); *Balta v. Ayco Co.*, 626 FSupp.2d 347, 362-364 (W.D. N.Y. 2009); *Highland Capital Mgmt. v. Schneider*, No. 02 Civ. 8098(PKL), 2008 WL 3884363, at *2-3 (I) (A) (2) (S.D. N.Y. Aug. 20, 2008); *Adani Exports Ltd. v. AMCI Export Corp.*, Civil Action No. 05-304, 2007 WL 4298525, at *11-18 (W.D. Pa. Dec. 4, 2007); *Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp.*, No. 05 Civ. 9485(LAP), 2007 WL 485617, at *11-18 (B) (S.D. N.Y. Feb. 13, 2007); *J.D. Irving, Ltd. v. Allen*, No. Civ. 98-357-P-H, 1999 WL 33117101, at *12-16 (III) (B) (D. Me. March 25, 1999); *United States v. Lightman*, 988 FSupp. 448, 458-462 (II) (C) (D. N.J. 1997); *United Intl. Holdings v. Wharf (Holdings) Ltd.*, 946 FSupp. 861, 867-868 (II) (C) (D. Colo. 1996); *Lehman Commercial Paper v. First Tenn. Bank Nat. Assn.*, No. 96 Civ. 5769 (BSJ), 1996 WL 640931 (S.D. N.Y. Nov. 6, 1996); *Provident American Corp. v. Loewen Group*, No. Civ. A. 92-1964, 1995 WL 105483, at *5-6 (E.D. Pa. March 10, 1995); *I.R.V. Merchandising Corp. v. Jay Ward Productions*, 856 FSupp. 168, 172-174 (A) (S.D. N.Y. 1994); *Temco Corp. v. Itel Rail Corp.*, No. 89 C 1894, 1990 WL 78323, at *3 (I) (C) (N.D. Ill. June 7, 1990); *Pyle v. Wolf Corp.*, 354 FSupp. 346, 352-354 (II) (A) (D.C. Or. 1972).

Finally, Turner argues that contracts dealing with complex, expensive business matters, such as those in this case, should be upheld only if in writing. The Statute of Frauds sets forth those contracts which are required to be in writing. OCGA § 13-5-30. And, the contract in this case does not fall within the purview of that statute. We are bound by the principle of statutory construction

---

1990); *Blanton Enterprises v. Burger King Corp.*, 680 FSupp. 753, 769-773 (D. S.C. 1988). We note that in *Manon*, 2005 U. S. Dist. LEXIS at *14-16 (III), the court entered summary judgment on a breach of oral contract claim based upon evidence that the parties' Letter of Intent had clearly expressed their intent not to be bound until execution of the purchase agreement. Although the Letter of Intent had expired, the court found that there was undisputed evidence demonstrating that the parties continued to operate under a belief that a written contract was necessary to finalize the agreement. Id. at *16 (III). Here, however, the objective evidence of the parties' intent following the expiration of the Letter of Intent was not undisputed; rather, the issue of the parties' intent was highly contested.

"that the express mention of one thing implies the exclusion of another thing." (Citation and punctuation omitted.) *City of Atlanta v. Southern States Benevolent Assn. of Ga.*, 276 Ga. App. 446, 455, n. 9 (623 SE2d 557) (2005). Acceptance of Turner's argument would require an amendment to the Statute of Frauds and thus presents a matter for the General Assembly to address. Based upon current Georgia law, no basis for reversal has been shown.

2. Turner also contends that the judgment must be reversed because McDavid's recovery should have been limited to nominal damages since there was no evidence that the condition for league approval would have been satisfied. Again, we disagree.

As discussed in Division (1) (a) (iv) above, the requirement for league approvals imposed a condition subsequent that each party was bound to use best efforts to fulfill. See *Jackson Elec. Membership Corp.*, 257 Ga. at 774 (1). Contrary to Turner's contention, the breach of a condition subsequent is a defense, for which the defendant, Turner, bore the burden of proof. See *Home Ins. Co. v. Palmour Hardware Co.*, 61 Ga. App. 868, 872 (7 SE2d 816) (1940); *Loewenherz v. Weil*, 33 Ga. App. 760, 770-771 (127 SE 883) (1925).

The evidence established that a written agreement was required to engage in the league approval process. In anticipation of the transaction, both parties had made contact with the league commissioners, and Turner's executives had expressed a belief that the leagues' approval would be obtained upon submission of the written agreement.[18] Although the parties had intended to execute written agreements for submission to the leagues, there was some evidence that their failure to do so was the result of Turner's breach.

Because there was evidence that Turner's breach prevented McDavid from pursuing league approval, Turner's defense fails. See OCGA § 13-4-23 ("If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance."); *Parkside Center, Ltd. v. Chicagoland Vending*, 250 Ga. App. 607, 614 (5) (552 SE2d 557) (2001); *Herrman*, 83 Ga. App. at 890-891 (1). See also *Oxford Motors Co. v. Niblack*, 183 Ga. App. 771, 772 (360 SE2d 23) (1987) ("Where

---

[18] McDavid had previously been approved as an owner of the Dallas Mavericks and had served on the NBA's Board of Governors. The NBA's president testified in this case. Although he could not opine whether McDavid's deal would have been approved since no written agreement had been submitted, he stated that McDavid's former service on the Board of Governors was a positive consideration. Turner's contention that the NBA would have required a financial personal guarantee that McDavid was unwilling to provide is also unavailing. The NBA's president stated that there were other ways to satisfy the league's concerns regarding liquidity to fund losses without a personal guarantee, such as obtaining partners or borrowing against other assets. McDavid testified that he had considered these alternatives for his transaction, and had been in contact with potential investors.

a defendant prevents the performance of a stipulation of a contract undertaken by the plaintiff, he is estopped from setting up in his own behalf any injury which may have resulted from the non-performance of such condition.") (citations and punctuation omitted).

3. Turner further argues that the trial court erred in failing to give its requested jury charge on the league approval requirement.

Turner's request to charge no. 56 read in pertinent part as follows:

### Damages; Plaintiff[s] Must Prove League Approval

Under each of Plaintiffs' claims, they seek as damages the difference between the allegedly agreed contract price for the teams and arena rights and the fair market value of the teams and arena rights. Before you can award Plaintiffs this measure of damages, you must find that Plaintiffs have proved, by a preponderance of the evidence, that the NBA and NHL would have approved the transfer of the teams and arena to Plaintiffs.

We discern no error in the trial court's failure to give this requested charge.

"[A] trial court does not err in refusing to give a requested charge that is not legally accurate and adjusted to the evidence. A request to charge . . . must not be so phrased so as to have the tendency to confuse and mislead the jury or to becloud the issues in the case." (Footnotes omitted.) *Wadkins v. Smallwood*, 243 Ga. App. 134, 139 (5) (530 SE2d 498) (2000). See also *Mattox v. MARTA*, 200 Ga. App. 697, 698 (2) (409 SE2d 267) (1991) ("If any portion of the request is inapt, incorrect, or not authorized by the evidence, denial of the request is proper.") (citation and punctuation omitted). The requested charge was incorrect in its assertion that McDavid had the burden of proving that the league approval condition would have been satisfied. As previously stated, the requirement for league approval was a condition subsequent to the contract and amounted to a defense for which Turner had the burden of proof. See *Home Ins. Co.*, 61 Ga. App. at 872; *Loewenherz*, 33 Ga. App. at 770-771.

Otherwise, the requested charge pertained to the requirement that a plaintiff must prove that the alleged breach was the cause of the damages, i.e., that damages were incurred as a result of the alleged breach. This principle was substantially covered in the trial court's general charge regarding the elements of causation and damages. The trial court charged that damages awarded for breach of contract cannot be vague, speculative, or uncertain; are awarded solely as compensation for the injury sustained by the plaintiffs;

cannot place the plaintiffs in a better position than they would have been in if the contract had not been breached; and must be traced solely to the breach of contract. "A requested charge is properly refused when the principle involved is substantially covered in the court's general charge." (Citation and punctuation omitted.) *Mattox*, 200 Ga. App. at 699 (2). See also *Ga. Dept. of Transp. v. Miller*, 300 Ga. App. 857, 864 (4) (a) (686 SE2d 455) (2009); *Collins & Assoc. v. Henry County Water &c. Auth.*, 290 Ga. App. 782, 785 (4) (661 SE2d 568) (2008) (we must look to the court's charge as a whole to determine whether it contained error). Because the trial court's general charge substantially covered the damages issue, no reversible error has been shown.

4. Lastly, Turner argues that the $281 million judgment entered upon the verdict must be reversed since the jury's damages award was speculative, excessive, and decidedly against the weight of the evidence.

> Generally, the jury's award cannot be successfully attacked so as to warrant a new trial unless it is so flagrantly excessive or inadequate, in light of the evidence, as to create a clear implication of bias, prejudice or gross mistake on the part of the jurors. Even though the evidence is such as to authorize a greater or lesser award than that actually made, the appellate court will not disturb it unless it is so flagrant as to shock the conscience. Moreover, the trial court's approval of the verdict creates a presumption of correctness that will not be disturbed absent compelling evidence.

(Punctuation and footnote omitted.) *Gold Kist v. Base Mfg.*, 289 Ga. App. 690, 692-693 (1) (658 SE2d 228) (2008). "A verdict will not be set aside as unsupported by the evidence when the amount of it is within the range covered by the testimony, though it may not correspond with the contentions of either party." (Citations and punctuation omitted.) *Ga.-Pacific Corp. v. Krulic*, 164 Ga. App. 454 (1) (297 SE2d 353) (1982). See also *City of Atlanta*, 290 Ga. App. at 210 (4) ("Where the amount of a verdict is within the range of testimony it will not be disturbed on appeal.") (citation and punctuation omitted); *Gold Kist*, 289 Ga. App. at 693 (1) (the amount of the jury verdict will be upheld if it is within the range of damages shown).

The jury was instructed that the proper measure of damages in this case was "the difference between the contract price and the fair market value of the [assets] at the time the contract was breached." The trial court further defined fair market value as "the price that [the asset] will bring when it is offered for sale by one who desires

but is not obliged to sell it and is bought by one who wishes to buy but is not under a necessity to do so." The parties raise no challenge to the propriety of the trial court's instructions in this regard.

The fair market value of the assets was a highly contested issue, and both parties presented experts who gave valuation opinions. Turner's expert, Donald Erickson, was an experienced business appraiser. Erickson opined that the fair market value was $255 million based upon 100% ownership of the assets, and that the contract price offered by McDavid was the determinative fair market value. Erickson's valuation was based upon the assumption of normal market conditions in which Turner was a willing seller, not under any compulsion, and in which McDavid was a knowledgeable buyer.

McDavid's experts were Roger Brinner, Ph.D., a renowned economist with experience in business valuations, and Robert Lieb, a consultant who specialized in sports economics.[19] Dr. Brinner opined that the value of the assets was $516 million for 100% ownership interest,[20] based upon a market approach method used to value the teams and an income approach method to value the arena. Dr. Brinner's opinion was based upon his finding that the contract price was low compared to comparable team assets and acquisition deals in the market.

Lieb opined that the value of the assets was approximately $647 million for 100% ownership interest.[21] Lieb also opined that McDavid's contract price was "amazingly low" based upon market comparables and did not reflect the fair market value of the assets.

In addition to the expert's opinions, there was evidence that *Forbes*, a valuation source, had valued the team assets at $340 million, excluding the arena value and debt. There was also evidence that Turner had internally valued the assets at $400 million.

Moreover, there was additional evidence that the actual contract price offered by McDavid and paid by Atlanta Spirit was not the fair market value of the assets. Significantly, board members of Turner's parent company had expressed concern that the assets had been

---

[19] Turner filed motions to exclude the testimony of McDavid's experts under OCGA § 24-9-67.1 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SC 2786, 125 LE2d 469) (1993), challenging their qualifications and valuation methodologies. The trial court denied Turner's motions. Turner does not enumerate the denial of its motions as error.

[20] According to Dr. Brinner, the Hawks' value was $294 million, the Thrashers' value was $116 million, and the arena rights value was $106 million. Dr. Brinner's valuation did not include the value of the arena debt. According to Lieb, a complete valuation of the assets should include the $140 million arena debt, which would increase Dr. Brinner's original value to $656 million.

[21] According to Lieb, the Hawks' value was $220 million, the Thrashers' value was $115 million, the arena value was $172 million, and the arena debt was $140 million.

undervalued and resulted in a "fire sale." There was other evidence showing that the teams had sustained financial losses, which impacted Turner's stock earnings and caused Turner to want to sell the assets and remove them from their financial records.[22] Internal e-mails exchanged between Turner executives indicated that they were facing "a lot of pressure ... to get a deal done." Turner executives had also stated that they "knew that given the losses this would be a difficult sale" and that "getting full value for these teams [was] not possible." Based upon these circumstances, the jury was authorized to find that Turner was selling the assets at a price below fair market value to draw potential buyers and to promote a quick sale. Under these circumstances indicating that the contract price was below fair market value, the contract price did not conclusively establish the value of the assets. See, e.g., *Dougherty County Bd. of Tax Assessors v. Burt Realty Co.*, 250 Ga. 467, 469 (298 SE2d 475) (1983) (where the property owners' asking price was not conclusive as to the fair market values of the properties for valuation purposes); *McCrary v. Pritchard*, 119 Ga. 876, 883 (47 SE 341) (1904) (recognizing that "[t]he amount paid is evidence of the value, but ... it is not conclusive of the value as it was represented to be"); *Shives v. Young*, 81 Ga. App. 30, 32 (1) (57 SE2d 874) (1950) (concluding that in light of all of the evidence — including the contract price, sales price, and estimated fair market value — the jury was authorized to place a higher market value on the property in determining its damages award).

As argued by McDavid, under Lieb's valuation, damages could be calculated at $335 million.[23] McDavid further argued that under the *Forbes* value, adjusted to include the $140 million arena debt and Dr. Brinner's $106 million arena value, damages could be calculated at $283 million.[24] Because the jury's $281 million verdict was within the range of the evidence, no basis for reversal has been shown.

We recognize that damages for breach of contract claims are compensatory awards designed to give the injured party the benefit of his bargain. See *John Thurmond & Assocs. v. Kennedy*, 284 Ga.

---

[22] McDavid and his advisors thought that the teams could be made profitable. McDavid had previously purchased a professional basketball team for $125 million and sold it for $280 million four years later.

[23] Lieb's total value of $647 million, adjusted to the 85% ownership interest, presented a fair market value of $549.95 million. Calculating the difference between the $215 million contact price and the $549.95 million fair market value yielded a damages estimation of $334.95 million.

[24] The *Forbes* total value of $586 million, adjusted to the 85% ownership interest, presented a fair market value of $498.1 million. Calculating the difference between the $215 million contract price and the $498.1 million fair market value yielded a damages estimation of $283.1 million.

469, 473-474 (2) (668 SE2d 666) (2008) ("[D]amages are intended to place an injured party, as nearly as possible, in the same position they would have been if the injury had never occurred. Juries, therefore, are given wide latitude in determining the amount of damages to be awarded based on the unique facts of each case.") (citations omitted); *Redman Dev. Corp. v. Piedmont Heating &c.*, 128 Ga. App. 447, 452 (3) (197 SE2d 167) (1973) ("The measure of damages in the case of a breach of contract is the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it entailed. In other words, the person injured[ ] is . . . to be placed in the position he would have been in had the contract been performed.") (citations omitted). "[T]he method of calculating damages should be flexible so as to reasonably compensate the injured party, and at the same time, be fair to all litigants." *John Thurmond & Assocs.*, 284 Ga. at 473-474 (2). In this case, Turner makes a compelling argument that the damages award seems disproportionate to the extent that it awarded McDavid more than he would have paid for the assets if the contract had not been breached. Nevertheless, Turner does not dispute that the measure of damages required the jury to determine the fair market value of the assets at the time of the breach. The trial evidence conflicted significantly as to whether the fair market value of the assets exceeded or was equivalent to the contract price, thereby presenting a question of fact for the jury's resolution in rendering its damages award. See *Jones v. Baran Co.*, 290 Ga. App. 578, 584 (2) (660 SE2d 420) (2008). "Our role is not to enter the jury box. The jury made its award in its enlightened conscience and based upon the evidence [presented]. Thus, as the trial court declined to disturb the jury's verdict, we likewise decline to find error." (Punctuation and footnotes omitted.) *Gold Kist*, 289 Ga. App. at 694 (1).

*Judgment affirmed. Smith, P. J., and Phipps, J., concur.*

DECIDED MARCH 26, 2010 —
RECONSIDERATION DENIED APRIL 9, 2010 — 

*Troutman Sanders, James A. Lamberth*, for appellant.
*Bondurant, Mixson & Elmore, Steven J. Rosenwasser, Joshua F. Thorpe, Jill Pryor*, for appellee.
*McNatt, Greene & Peterson, Hugh B. McNatt, Balch & Bingham, Michael J. Bowers, T. Joshua R. Archer, Brinson, Askew, Berry, Seigler, Richardson & Davis, Robert M. Brinson, Norman S. Fletcher, Alston & Bird, John E. Stephenson, Jr., Jeffrey J. Swart, Andrew J. Tuck*, amici curiae.